**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| MOHAMMAD HASAN ALSYOUF, | ) | NO. EDCV 11-1867 SS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM DECISION AND ORDER** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**I.**

**INTRODUCTION**

Mohammad Hasan Alsyouf ("Plaintiff") brings this action seeking to overturn the decision of the Commissioner of the Social Security Administration (hereinafter the "Commissioner" or the "Agency") denying his application for Supplemental Security Income benefits ("SSI"). The parties consented, pursuant to 28 U.S.C. § 636(c), to the jurisdiction of the undersigned United States Magistrate Judge. For the reasons stated below, the decision of the Agency is AFFIRMED.

## II.

### PROCEDURAL HISTORY

Plaintiff filed an application for SSI on February 2, 2005. (Administrative Record ("AR") 89).  He alleged a disability onset date of October 24, 2002.  Id.).  His last-insured date was June 30, 2006. (AR 696).  The Agency initially denied this claim on April 15, 2005. (AR 75).  After Plaintiff requested and received reconsideration of his claim, Plaintiff's claim was denied again on July 15, 2005.  (AR 82).

On August 28, 2005, Plaintiff filed a written request for hearing. (AR 87).  Plaintiff testified at a hearing held before Administrative Law Judge ("ALJ") Henry M. Tai on March 14, 2007.  On March 14, 2007, the ALJ issued a decision denying benefits.  (AR 43-56).

On May 18, 2007, Plaintiff requested that the Appeals Council review the ALJ's decision.  (AR 40).  The Appeals Council denied Plaintiff's request on August 3, 2009.  (Id.).  Plaintiff then filed a civil action, which resulted in a Memorandum Decision and Order reversing the ALJ's determination and remanding the action for further proceedings.  (AR 578-93).  The Court concluded that ALJ Tai failed to properly assess whether Plaintiff's mental health impairment was severe. (AR 582-83).  Specifically, the Court explained that there was objective evidence that Plaintiff suffered from a mental health impairment and ALJ Tai failed to follow the Secretary's regulations for evaluating such impairments.  (AR 586).  The Court also explained that the ALJ erred in basing his determination that Plaintiff's mental impairment was not

1  severe in part on the fact that Plaintiff had not been hospitalized for
2  psychiatric treatment.  (AR 586).

3

4      The Court required the Agency to consider three issues on remand.
5  First, the Court instructed the ALJ to "rate the degree of functional
6  loss resulting from the impairment by considering four areas of function
7  (a)  activities  of  daily  living;  (b)  social  functioning;  (c)
8  concentration,  persistence,  or  pace;  and  (d)  episodes  of
9  decompensation." (AR 587 n.4) (citing 20 C.F.R. § 416.920a(c)(2)-(4)).
10 The ALJ was further instructed to "determine whether the claimant has
11 a severe mental impairment" after rating the degree of loss.  (Id.)
12 (citing C.F.R. § 416.920a(d)).  The Court noted that if the ALJ were to
13 determine that Plaintiff has a severe mental impairment, the ALJ must
14 then determine whether it meets or equals a listing in 20 C.F.R. Part
15 404, Subpart P, Appendix 1.  (Id.) (citing C.F.R. § 416.920a(d)(2)).
16 The Court also explained that if a listing is not met, the ALJ must
17 assess Plaintiff's residual functional capacity ("RFC") and incorporate
18 into the ALJ's decision the pertinent findings and conclusions regarding
19 Plaintiff's mental impairment, including a specific finding as to the
20 degree of limitation in each of the functional areas described in C.F.R.
21 § 416.920a(c)(3).  (Id.) (citing C.F.R. § 416.920a(d)(3), (e)(2)).

22

23     Second, the Court instructed the ALJ to take the testimony of a
24 vocational expert.  Specifically, the Court noted that the ALJ erred in
25 relying solely on the Medical-Vocational Guidelines ("Grids") when
26 assessing whether Plaintiff is disabled.  Where, as in Plaintiff's case,
27 the  claimant  has  both  exertional  and  significant  non-exertional
28

3

1  limitations, the Grids are inapplicable and the ALJ must take the

2  testimony of a vocational expert.  (AR 588) (citing <u>Burkhart v. Bowen</u>,

3  856 F.2d 1335, 1340 (9th Cir. 1988)).

4

5      Third, the Court instructed the ALJ to consider Plaintiff's

6  subjective pain testimony, explaining that the first ALJ decision failed

7  to provide clear and convincing reasons to reject such testimony.  (AR

8  590-91).

9

10     Pursuant to this Court's remand, the Appeals Council vacated the

11  ALJ's decision on February 9, 2011.  (AR 596).  On May 11, 2011,

12  Plaintiff testified at a hearing held before ALJ Tamara Turner-Jones.

13  (AR 689-722).  The ALJ denied Plaintiff's claim on July 29, 2011.  (AR

14  563-77).  The ALJ's decision became the final decision of the

15  Commissioner on August 29, 2011.  Plaintiff requested judicial review

16  by filing the instant action on November 23, 2011.

17

18                              **III.**

19                       **FACTUAL BACKGROUND**

20

21     Plaintiff, who was forty-nine at the time of the second ALJ

22  hearing, has a high school education and three years of college.  (AR

23  357).  Plaintiff worked as a gas station cashier, car salesman, and auto

24  trader driver from 1998 until his alleged disability onset date of

25  October 24, 2002.  (AR 106, 114, 131, 964).  Plaintiff also worked as

26  a gas station cashier from 1992 to 1993.  (AR 131).  During the second

27  ALJ hearing, Plaintiff stated that he had not sought work since October

28

                                 4

24, 2002 and instead supports himself with help from his brother and a $130,000 lump-sum workers' compensation settlement that he received in 2007.  (AR 694-95).  Plaintiff claims that he cannot walk without difficulty, cannot sit for extended periods of time, has nerve damage to his leg, and has numbness and no feeling in his left ankle. (AR 696-707).

Plaintiff also complains that he became less self sufficient following the 2002 incident.  He testified that he stopped driving immediately after the incident, although Plaintiff also testified that he later resumed driving to the market, shopping center, and pharmacy by himself.  (AR 697).  Plaintiff further complains of an inability to handle finances, although the third party functionality report completed by Plaintiff's wife states that his ability to handle money has not changed since his disability onset date.[1]  (AR 126).  On a daily basis, Plaintiff reads, watches tv, exercises, naps, and does "minimum walking."  (AR 114, 122).

\\
\\
\\
\\

---

[1]   The Court notes, however, that Plaintiff's wife may have intended to state that his ability to handle money has changed since the October 2002 incident.  Plaintiff's wife checked the "no" box on a form asking whether there had been such a change in Plaintiff's ability.  In explaining her answer, Plaintiff's wife added that Plaintiff has "no patience or concentration."  (AR 126).

**A.   <u>Plaintiff's Medical History</u>**

Plaintiff has seen a variety of medical professionals between his alleged disability onset date and when he filed for benefits.  The Court summarizes Plaintiff's medical history below.

After being injured during a robbery at his workplace on October 24, 2002, Plaintiff sought treatment from the Riverside County Regional Medical Center Emergency Department for a gunshot wound to his left thigh.  (AR 167-68, 705).  An x-ray showed "no fracture within the femur."  (AR 185).  Plaintiff also sought treatment for injuries sustained when he was hit in the head during the incident.  (AR 176).  Plaintiff was treated and released after his symptoms were resolved within seventy-six hours.  (AR 179).

On November 19, 2002, Plaintiff saw Dr. Stephen P. Suzuki for a complex orthopaedic consultation regarding injuries sustained in the October incident.  (AR 193).  Dr. Suzuki noted that Plaintiff complained of neck pain, left thigh pain, left leg weakness, and left ankle pain.  (<u>Id.</u>).  However, Dr. Suzuki reported that Plaintiff had a normal range of motion and motor strength in all but his lower extremities.  (AR 196-97).  Plaintiff presented with "a through and through gunshot wound to the left thigh.  The enter and exit wounds [were] clean and dry at [the time of the exam].  There [was] no surrounding fluctuance.  There [was] very minimal erythema around the actual gunshot sites.  There [was] no drainage.  There [were] no palpable masses."  (AR 198).  With respect to Plaintiff's left ankle, Dr. Suzuki observed "a mild amount of soft

tissue swelling" coupled with "limited motion." (Id.). Dr. Suzuki also noted that cervical spine x-rays showed "no evidence of specific fractures, dislocations, or calcifications." (AR 198-99). X-rays taken of Plaintiff's left ankle showed arthritis of the ankle joint, while x-rays of his left foot and femur showed "no fractures dislocations, or calcifications." (AR 199). Plaintiff was "alert and oriented" during the examination and appeared to have a good memory. (AR 194). Dr. Suzuki also reported that Plaintiff "sits, stands, and ambulates independently." (Id.).

Dr. Suzuki diagnosed Plaintiff with (1) "[l]eft thigh gunshot wound through and through with severe quadriceps atrophy," (2) cervical spine strain and contusion and headaches, and (3) chronic arthritis in the left ankle. (Id.). He prescribed physical therapy along with both pain medication and muscle relaxants. (Id.). Medical records indicate that Plaintiff went to seven physical therapy appointments and missed three, at which point he was discharged for failure to attend appointments despite progress being noted on the physical therapy reports. (AR 202).

Plaintiff's primary treating physician was Dr. Anthony T. Fenison, who Plaintiff first saw in early December 2002 for back pain, head and neck pain, and left leg pain and numbness. (AR at 321). According to medical records, Plaintiff saw Dr. Fenison at various points between December 2002 and January 2004. (See AR 317, 321). On January 7, 2004, Dr. Fenison reported that while Plaintiff initially presented with difficulties with his foot and ankle and left upper extremity, "these areas have improved with appropriate conservative care." (AR 330). Dr.

1  Fenison concluded that Plaintiff was "permanent and stationary for
2  rating purposes" and opined that Plaintiff should be "limited to light
3  work . . . in a very benign atmosphere" and not "placed [in] an
4  environment that will require stressful interactions or an environment
5  that might place him at increased risk of encountering another
6  assailant." (AR 331).

8      Additionally, at various points between December 29, 2002 and
9  January 5, 2004, Plaintiff sought chiropractic treatment from Dr. Derick
10 Lajom for neck pain and muscle spasms. (AR 203-23). On at least one
11 occasion, Dr. Lajom noted that Plaintiff was "responding well to the
12 current treatment regimen." (AR 212).

14     On June 17, 2003, Plaintiff saw Dr. Jurkowitz for a qualified
15 medical evaluation in neurology. (AR 245). Dr. Jurkowitz reviewed
16 Plaintiff's medical record and performed a physical examination and
17 neurological examination. (AR 264-65). On June 23, 2003, Dr. Jurkowitz
18 diagnosed Plaintiff with posttraumatic headaches, cervical sprain,
19 lumbosacral sprain and possible radiculopathy, and "pain syndrome of
20 left lower extremity which is turning into some sort of chronic pain."
21 (AR 263). However, Dr. Jurkowitz also reported that Plaintiff's mental
22 status was "[g]rossly normal, although [Plaintiff was] somewhat nervous
23 and certainly . . . phobic about needles." (AR 262). While Dr.
24 Jurkowitz reported that Plaintiff evidenced "atrophy of the left lower
25 extremity," he also noted that Plaintiff had "normal strength in the
26 upper extremities" and that Plantiff had "normal strength" in his right
27 lower extremity. (Id.). After a subsequent evaluation on March 31,
28

8

2004, Dr. Jurkowitz reported that Plaintiff's mental status seemed normal, although Plaintiff evidenced a "somewhat flattened affect." (AR 248). Dr. Jurkowitz also reported that while it was impossible to test strength in Plaintiff's left lower extremity because it was then "too tender to touch," Plaintiff retained "normal strength in both upper extremities and right lower extremity." (Id.). Dr. Jurkowitz again diagnosed Plaintiff with posttraumatic headaches, cervical sprain, lumbosacral sprain and possible radiculopathy, and pain syndrome in the left lower extremity. (AR 249).

Plaintiff sought pain management treatment from Dr. Andrew W. Hesseltine. On August 5, 2003, Dr. Hesseltine reported that "[Plaintiff] states that overall he is doing well." (AR 272). Plaintiff was then given refills of Remeron 15 mf, Lidoderm 5% patch, Bextra 10 mg tab, and Effexor XR 75 mg tab. (AR 273). A few months later, on July 24, 2003, complaining of neck pain, Plaintiff received an MRI from Dr. Ronald Otto. (AR 275-77). Dr. Otto found no significant problems. (AR 276).

Additionally, Plaintiff sought psychological treatment from Dr. Marilyn Neudeck-Dicken, PhD. (AR 224-243). Plaintiff's first visit appears to have been on May 21, 2003. (AR 234). However, the earliest treatment notes from Dr. Neudeck-Dicken are from May 29, 2003. (AR 238). At that time, Plaintiff complained of anxiety, depression, difficulty sleeping, and other psychological symptoms associated with the October 2002 incident. Dr. Neudeck-Dicken diagnosed Plaintiff with possible posttraumatic stress disorder, chronic. (AR 243). However,

1   On March 16, 2004, Dr. Neudeck-Dicken reported that Plaintiff "has made
2   great strides in his posttraumatic stress disorder" and that his
3   "depression has greatly improved" even though he still demonstrates "the
4   effects of a depressive triad of negative views of self worth, present
5   living, and his future." (AR 234). Dr. Neudeck-Dicken also reported
6   that Plaintiff was "no longer isolating himself within his home" and was
7   "getting out and going places," including "trips with his wife." (Id.).
8   Further, while Plaintiff still showed symptoms of anxiety, Dr. Neudeck-
9   Dicken noted that Plaintiff's anxiety was "less[ened] when he use[d] his
10  relaxation exercises." (Id.). Dr. Neudeck-Dicken also reported that
11  Plaintiff's "feeling of helplessness and hopelessness [was] not as
12  great." (Id.). At that time, Plaintiff's "cognitive functioning [was]
13  greatly improved," with Plaintiff "no longer confused" and
14  "demonstrat[ing] increased concentration." (AR 235). Plaintiff was
15  "reading, going to the library, and using his computer to study various
16  subjects of interest to him," although he retained signs of PTSD.
17  (Id.). On May 8, 2004, however, Plaintiff still complained of
18  psychological symptoms stemming from the October 2002 incident. (AR
19  230). According to Dr. Neudeck-Dicken's notes, Plaintiff reported
20  "nightmares nightly and recurrent recollections of the incident" in
21  addition to difficulty sleeping and difficulty returning to sleep.
22  (Id.). Plaintiff further reported being anxious, "in a hyper-alert
23  state," and feeling weak and vulnerable. (Id.). He also complained of
24  depression associated with self doubt and loss in self confidence, loss
25  of interest in previously enjoyed activities, and difficulty
26  concentrating and making decisions. (Id.). Dr. Neudeck-Dicken
27  diagnosed Plaintiff with chronic posttraumatic stress disorder ("PTSD"),
28

with "mixed anxiety and depressed mood" in addition to sleep terror disorder and possible dependent personality with "[n]egativistic personality traits." (AR 231). Later, in response to a June 22, 2005 request by the State of California Department of Social Services, Dr. Neudeck-Dicken noted that Plaintiff was able to manage funds on his own behalf. (AR 229). Dr. Neudeck-Dicken also noted that Plaintiff's PTSD "does not interfere with" activities including "properly car[ing] for personal affairs, do[ing] shopping, cook[ing], us[ing] public transportation, pay[ing] bills, maintain[ing] residence, [and] car[ing] for grooming and hygiene . . . ." (AR 227). Finally, Dr. Neudeck-Dicksen noted that she "see[s] no problem" in concentration and task completion, including Plaintiff's ability to sustain focused attention, complete everyday household routines, and follow and understand simple written or oral instructions. (AR 228).

**B.   <u>Consultative Evaluations</u>**

    **1.   Psychiatric Evaluations**

Plaintiff saw Dr. Romualdo R. Rodriguez, M.D., for a complete psychiatric evaluation at the request of the Department of Social Security. (AR 355, 361). No psychiatric records were reviewed in the examination and Plaintiff was the sole source of information for the evaluation. (AR 355) (observing that Plaintiff "appears to be a reliable historian"). In a March 15, 2005 summary of that evaluation, Dr. Rodriguez reported that Plaintiff complained of "becoming depressed, irritable, and anxious." (AR 356). Plaintiff further complained of

11

suicidal feelings, nightmares, homicidal feelings toward his wife, and problems with memory and concentration. (Id.). However, Dr. Rodriguez reported that medication "significantly improved" the nightmares. (Id.). Further, Dr. Rodriguez reported that Plaintiff does household chores and "can take care of self-dressing, bathing, and personal hygiene." (AR 357). Plaintiff also drives his own automobile for transportation. (Id.). He watches TV, walks, and reads. (Id.). Plaintiff is able to "handle cash and pay bills appropriately." (Id.). His thought process was "coherent and organized" with "no tangentiality or loosening of associations." (AR 358). Dr. Rodrigez found Plaintiff "relevant and non-delusional" and without "bizarre or psychotic thought content." (Id.). Further, while Plaintiff previously had suicidal and homicidal ideation, Dr. Rodriguez reported that Plaintiff had no plans or intent at that time. (Id.). Dr. Rodriguez noted that "[t]here is no homicidal or paranoid ideation. He denies recent auditory or visual hallucinations." (Id.). While Plaintiff described his mood as "somewhat despondent," he was "alert and oriented to time, place, person, and purpose." (Id.). Plaintiff also "appear[ed] to be of at [sic] least average intelligence." (AR 358). Plaintiff could perform serial threes as well as simple mathematic problems and was able to follow conversation well. (AR 359). As for Plaintiff's insight and judgment, Dr. Rodriguez reported that "[i]nsight into his problems appears reasonable in that he is using medications for his nightmares and post traumatic stress disorder." (Id.) (adding that Plaintiff "would be able to handle the situation of a lost child in a department store"). Dr. Rodriguez diagnosed Plaintiff with PTSD and observed that Plaintiff was "reasonably stable" on his psychiatric medication, "has

no functional limitations" based on the examination, and "is capable of independently managing funds in an appropriate manner at this time." (AR 360).

## 2.   Orthopedic Evaluations

On March 17, 2005, Dr. Laurence Meltzer summarized the results of a complete orthopedic evaluation done at the request of the Department of Social Services.   According to Dr. Meltzer, Plaintiff's primary complaint was pain in the neck, knees, ankle, feet, and lower back.   (AR 362).   Dr. Meltzer reported that Plaintiff "is a well-developed, well-nourished male who is alert and cooperative."   (Id.).   Plaintiff's range of motion in his hips, knees, ankles, and feet was normal.   (Id.). Further, while there was "some left lower extremity muscle weakness in comparison to the right" and there was atrophy to Plaintiff's left thigh and calf muscles as compared to the right, Plaintiff's motor strength was "otherwise grossly within normal limits."   (AR 366).   In sum, Dr. Meltzer found that Plaintiff had residual femoral nerve neuropathy and atrophy of the left lower extremity but that the examination provided no support for claims of neck and back pain, left knee pain, left ankle discomfort, or upper extremity problems.   (Id.).   Dr. Meltzer concluded that Plaintiff "could lift 20 pounds occasionally and 10 pounds routinely" in addition to being able to "sit for unlimited periods of time and stand and walk with his cane 4 hours in an 8-hour workday, alternating sitting and standing every hour."   (Id.).

\\

13

C.   **Medical History After Last-Insured Date**

After the last-insured date, on November 19, 2007, Dr. Nick Sharma conducted an orthopedic examination of Plaintiff.  Plaintiff reported that on November 14, 2007, he was driving a car when he collided with another vehicle.  (AR 638-39).  Plaintiff complained of headaches in addition to pain in his neck, left shoulder, chest, and lower back.  (AR 640).  Further, while Plaintiff complained that the condition of his left leg had worsened, Dr. Sharma found that Plaintiff had a normal gait and evidenced no difficulty toe walking, heel walking, kneeling, or squatting.  (AR 640-45).  Dr. Sharma also reported that Plaintiff had a full range of motion of the lower extremities and that examination of the ankles "revealed no tenderness." (Id.).  He recommended continuing chiropractic treatment.  (AR 646).

Also after the last-insured date, on February 20, 2008, Plaintiff was hospitalized for acute chest pain.  (AR 510).  An echocardiogram showed left ventricular ejection fraction and severe hypokinesia of the posterior lateral wall of left ventricle.  (Id.).  However, Plaintiff was "able to move 4 extremities voluntarily or on command."  (AR 516). Plaintiff underwent stent placement without complication.  (AR 518-22).

On April 15, 2008, Plaintiff again saw Dr. Neudeck-Dicken for treatment.  (AR 650).  In a treatment report dated April 25, 2008, Dr. Neudeck-Dicken found that Plaintiff's condition worsened following a heart attack that occurred in 2007, after his last-insured date.  (AR 652-63).  Specifically, Dr. Neudeck-Dicken reported that while Plaintiff

14

was making great progress until that heart attack, "his heart attack has caused his PTSD to escalate at greater degree then [sic] in the past years." (AR 650, 652). Dr. Neudeck-Dicken noted that "[a]n incident such as a heart attack, [sic] can cause the reoccurrence of the symptoms of PTSD." (AR 652). Dr. Neudeck-Dicken further noted that "[Plaintiff's] symptoms have increased post the heart attack causing depression and anxiety, as well as the escalation of with-drawl [sic] behaviors." (AR 652-63). Dr. Neudeck-Dicken diagnosed Plaintiff with "Posttraumatic Stress Disorder, Chronic," "Adjustment Disorder with mixed Anxiety and depressed mood [sic]," "Adjustment Disorder with withdrawal [sic]," and "Somatization Disorder." (AR 655). However, Dr. Neudeck-Dicken reported that "[Plaintiff's] PTSD was under control" before the heart attack. (AR 656) (noting that Plaintiff was able to "leave his home with his wife and travel to Las Vegas").

On May 26, 2008, Dr. Oluwafemi Adeyemo conducted a single psychiatric consultive examination of Plaintiff. (AR 658). According to Dr. Adeyemo, Plaintiff complained of "not doing well" due to depressive symptoms and anxiety stemming from the October 2002 incident. (Id.). While Plaintiff was unable to spell "world" backwards, had slow speech, and claimed he had memory problems, Plaintiff was oriented to self and place and appeared alert. (AR 658-660). Dr. Adeyemo diagnosed Plaintiff with PTSD, a GAF score of 45, and major depressive disorder. (AR 660). He also concluded that Plaintiff would have "difficulty responding appropriately to co-workers, supervisors, and the public." (Id.).

15

**D.   Vocational Expert's Testimony**

A vocational expert testified at Plaintiff's 2011 hearing.  (AR 711-21).  The expert testified that Plaintiff worked as a cashier, automobile sales person, light truck driver, and cashier checker.  (AR 711).  The expert also testified that a hypothetical individual of Plaintiff's vocational profile and RFC would not be able to perform Plaintiff's past relevant work.  (AR 712).  The vocational expert testified that such a person would be able to work as a bench assembler of small products, surveillance system monitor, or information clerk.  (Id.).  The vocational expert also testified that performance of the three jobs would not be prevented if the ALJ were to further restrict the hypothetical by providing that "such person would work better with objects than with individuals, but interaction with coworkers and general public is not precluded."  (AR 714-15).  The vocational expert testified that even if such person could not deal with the public at all, performance of the small products assembler and information system monitor jobs would remain possible.  (Id.).  Finally, upon questioning by counsel, the vocational expert testified that adding a requirement that such person must use a cane whenever standing or walking would not preclude performance of any of the three jobs.  (AR 715).

**E.   Lay Witness Testimony**

On February 15, 2005, Rosa Alsyouf, Plaintiff's wife, submitted a third party function report.  (AR 122-130).  Ms. Alsyouf reported that between waking up and going to bed, Plaintiff reads, watches television,

16

exercises, naps, and does "minimum [sic] walking." (AR 122).  According to Ms. Alsyouf, Plaintiff has sleeping problems and requires assistance in dressing, bathing, shaving, and sitting and standing when using the toilet.  (AR 123).   Ms. Alsyouf further reported that Plaintiff does not perform yard work, rarely goes outside, does not shop, and does not drive.  (AR 124-25).  She noted that Plaintiff can count change but is unable to pay bills or handle a savings account because he is "unable to remember [and] says [he] doesn't feel like handling finances."  (AR 125).

**F.   Plaintiff's Testimony**

At the 2011 ALJ hearing, Plaintiff testified that he stopped working in 2002 because he is "scared from [sic] doing anything," because he "cannot focus on things," and because his "leg is shrinking." (AR 694, 700).   The ALJ was careful to instruct Plaintiff that the period of time relevant to the hearing was Plaintiff's alleged disability onset date of October 24, 2002 to his last-insured date of June 30, 2006.  (AR 696).  Plaintiff testified that during that period, he had difficulty taking a shower and bathing without assistance. (Id.).  Plaintiff further testified that prior to 2006, his wife went to the market and did grocery shopping.  (AR 697).   Plaintiff also testified that prior to 2006, he did not drive himself to doctors' appointments.  (AR 699).  However, Plaintiff testified that he now drives to the shopping center, market, and pharmacy.  (AR 693).  When the ALJ asked Plaintiff why he now drives himself to the market,

1  Plaintiff stated that his wife was more attentive prior to 2006.  (Id.).
2  Plaintiff testified that he uses a cane every day.  (AR 701).

3

4                              **IV.**

5            **THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**

6

7       To qualify for disability benefits, a claimant must demonstrate a
8  medically determinable physical or mental impairment that prevents him
9  from engaging in substantial gainful activity[2] and that is expected to
10 result in death or to last for a continuous period of at least twelve
11 months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing
12 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant
13 incapable of performing the work he previously performed and incapable
14 of performing any other substantial gainful employment that exists in
15 the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir.
16 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

17

18      To decide if a claimant is entitled to benefits, an ALJ conducts
19 a five-step inquiry.  20 C.F.R. § 416.920.  The steps are:

20

21      (1)  Is the claimant presently engaged in substantial gainful
22           activity?  If so, the claimant is found not disabled.
23           If not, proceed to step two.

24

25

26 _____
         [2]   Substantial gainful activity means work that involves doing
27 significant and productive physical or mental duties and is done for pay
   or profit.  20 C.F.R. § 416.910.
28
                              18

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing h[er] past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work? If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. § 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54.  If, at step four, the claimant meets her burden of establishing an inability to perform the past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education and work experience.  Tackett, 180 F.3d at 1100; 20 C.F.R. § 416.920(g)(1).  The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P,

1   Appendix 2 (commonly known as "the Grids").  Osenbrock v. Apfel, 240

2   F.3d 1157, 1162 (9th Cir. 2001).  When a claimant has both exertional

3   (strength-related)   and   nonexertional   limitations,   the   Grids   are

4   inapplicable and the ALJ must take the testimony of a vocational expert.

5   Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

6

7                                    **V.**

8                         **THE ALJ'S DECISION**

9

10      On remand, ALJ Tamara Turner-Jones correctly noted that Plaintiff

11  filed an application for disability and disability insurance benefits

12  on November 3, 2004, with a claimed disability onset date of October 24,

13  2002.   (AR  566).   As  ALJ  Turner-Jones  also  noted,  Plaintiff's

14  application was previously denied by ALJ Tai on May 18, 2007.  (See

15  id.).  However, after the Appeals Council denied Plaintiff's request for

16  review, this Court reversed the first ALJ decision and remanded the case

17  for further administrative proceedings.  As discussed in the section on

18  procedural history, pursuant to this Court's order, the Appeals Council

19  directed ALJ Turner-Jones to (1) evaluate Plaintiff's mental impairment

20  as  a  severe  impairment;  (2)  re-evaluate  the  Plaintiff's  residual

21  functional capacity with non-exertional mental limitations and procure

22  the testimony of a vocational expert to consider both the exertional and

23  non-exertional  limitations  of  Plaintiff;  and  (3)  further  evaluate

24  Plaintiff's subjective pain testimony.

25

26  \\

27  \\

28

                                    20

Plaintiff appeared and testified at a hearing held before ALJ Turner-Jones on May 11, 2011.  An impartial vocational expert also testified at the hearing.  (AR 691-772).

ALJ Turner-Jones then employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled under the Social Security Act.  (AR 566-77).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of October 24, 2002.  (AR 569).  At step two, the ALJ found that Plaintiff had the severe impairments of "degenerative spondylosis, status post gunshot wound to the left anterior thigh with residual neuropathic pain in the left lower extremity, a major depressive disorder, and an anxiety disorder."  (Id.).  At step three, the ALJ throughly considered the impairments listed in step two and found that, through the last-insured date, none of them met or medically equaled a listed impairment.  (AR 569-70).  The ALJ then found that Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform sedentary work (20 CFR 404.1567(a)). [Plaintiff] could lift and carry 10 pounds occasionally and less than 10 pounds frequently.  He could sit for 6 hours out of an 8-hour workday, and he could stand and walk for 2 hours out of an 8-hour workday.  He could not climb ladders, ramps, or scaffolds.  He could occasionally climb ramps and stairs; and he could occasionally kneel, stoop, and crawl.  His mental impairment limited him to simple, repetitive tasks, which

1  were not production line.  He could work in an object-
2  oriented work environment.

3

4  (AR 570).  Next, at step four, the ALJ found that Plaintiff could not
5  return to his past work.  (AR 575).  The ALJ relied on the testimony of
6  a vocational expert in coming to this conclusion.  (Id.).  Finally, at
7  step five, the ALJ found that "considering [Plaintiff's] age, education,
8  work experience, and residual functional capacity, there were jobs that
9  existed in significant numbers in the national economy that [Plaintiff]
10 could have performed."  (AR 576).  In coming to this conclusion, the ALJ
11 relied on the vocational expert's testimony that a person with
12 Plaintiff's RFC would be able to work as a bench assembler of small
13 products, surveillance system monitor, or information clerk.  (See AR
14 712).  The ALJ found that Plaintiff was not disabled because Plaintiff
15 could have performed work that existed in significant numbers in the
16 national economy.  (AR 576).

17

18 **VI.**

19 **STANDARD OF REVIEW**

20

21   Under 42 U.S.C. § 405(g), a district court may review the
22 Commissioner's decision to deny benefits.  The court may set aside the
23 Commissioner's decision when the ALJ's findings are based on legal error
24 or are not supported by substantial evidence in the record as a whole.
25 Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001); Smolen v.
26 Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).  "Substantial evidence is
27 more than a scintilla, but less than a preponderance."  Reddick, 157
28 F.3d at 720.  It is "relevant evidence which a reasonable person might

accept as adequate to support a conclusion." Id.  To determine whether
substantial evidence supports a finding, the court must "'consider the
record as a whole, weighing both evidence that supports and evidence
that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d
at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).
If the evidence can reasonably support either affirming or reversing
that conclusion, the court may not substitute its judgment for that of
the Commissioner.  Reddick, 157 F.3d at 720-21.

## VII.

### DISCUSSION

Plaintiff contends the ALJ erred for four reasons.  First,
Plaintiff alleges that the ALJ failed to properly consider Plaintiff's
subjective complaints and properly assess his credibility.  (Id. at 13).
Second, Plaintiff argues that the ALJ erred in "fail[ing] to mention the
primary treating physician permanent and stationary report prepared by
the treating orthopedic surgeon Dr. Anthony T. Fenison, M.D. dated
January 7, 2004." (Complaint Mem. at 4).  Third, Plaintiff contends
that reports from Dr. Neudeck-Dicken and Dr. Adeyemo establish that "his
mental symptoms and limitations are far more severe than as found by the
ALJ in her residual functional capacity assessment." (Id. at 9).
Fourth, Plaintiff contends that his residual functional limitations
preclude him from performing the jobs identified by the vocational
expert and that the vocational expert provided incorrect definitions of
the jobs the ALJ found that Plaintiff could perform.  (Id. at 19-24).

23

1  However, the Court finds that Plaintiff's claims lack merit.  For the
2  reasons discussed below, the Court finds that the ALJ's decision should
3  be AFFIRMED.

4

5  **A.    The ALJ Provided Clear And Convincing Reasons For Rejecting**
6  **Plaintiff's Credibility**

7

8       Plaintiff contends that the ALJ failed to properly consider his
9  subjective complaints.  (Complaint Mem. at 13).  In sum, Plaintiff
10 claims that the ALJ failed to provide clear and convincing reasons to
11 reject Plaintiff's testimony regarding the severity of his symptoms.
12 (Id. at 17).  The Court disagrees.

13

14      In assessing the credibility of a claimant's testimony regarding
15 subjective pain or the intensity of symptoms, the ALJ engages in a
16 two-step analysis.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir.
17 2009).  First, the ALJ must determine whether there is "'objective
18 medical evidence of an underlying impairment which could reasonably be
19 expected to produce the pain or other symptoms alleged.'"  Id. (quoting
20 Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)).  If the
21 claimant has presented such evidence, and there is no evidence of
22 malingering, then the ALJ must give "'specific, clear and convincing
23 reasons'" in order to reject the claimant's testimony about the severity
24 of the symptoms.  Id. (quoting Lingenfelter, 504 F.3d at 1036).  At the
25 same time, the ALJ is not "required to believe every allegation of
26 disabling pain, or else disability benefits would be available for the
27 asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)."  Fair
28 v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).

1    In evaluating the claimant's testimony, the ALJ may use "'ordinary
2  techniques of credibility evaluation.'" Turner v. Comm'r of Soc. Sec.,
3  613 F.3d 1217, 1224 n.3 (9th Cir 2010) (quoting Smolen, 80 F.3d at
4  1284). For instance, the ALJ may consider inconsistencies either in the
5  claimant's testimony or between the testimony and the claimant's
6  conduct, "unexplained or inadequately explained failure to seek
7  treatment or to follow a prescribed course of treatment," and "whether
8  the claimant engages in daily activities inconsistent with the alleged
9  symptoms." See Turner, 613 F.3d at 1224 n.3 (internal quotation marks
10  omitted), Tommasetti v. Astrue, 533 F.3d at 1035, 1039 (9th Cir 2008)
11  (internal quotation marks omitted), Lingenfelter, 504 F.3d at 1040.
12  While a claimant need not "vegetate in a dark room" in order to be
13  eligible for benefits, Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir.
14  1987) (internal quotation omitted), the ALJ may discredit a claimant's
15  testimony when the claimant reports participation in everyday activities
16  indicating capacities that are transferable to a work setting. See
17  Morgan, 169 F.3d at 600. Further, even where those activities suggest
18  some difficulty functioning, they may be grounds for discrediting the
19  claimant's testimony to the extent that they contradict claims of a
20  totally debilitating impairment. See Turner, 613 F.3d at 1225.
21  Likelihood of exaggeration is a clear and specific reason for
22  discounting a plaintiff's testimony. See Tonapetyan v. Halter, 242 F.3d
23  1144, 1148 (9th Cir. 2001). A plaintiff's conflicting testimony may
24  also serve as clear and convincing grounds to reject such testimony.
25  Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002).
26
27    Here, there was medical evidence of an underlying impairment.
28  However, the ALJ gave specific, clear and convincing reasons to reject

25

1  Plaintiff's testimony about the severity of his symptoms.  Indeed, the

2  ALJ thoroughly reviewed Plaintiff's medical record before explaining

3  that the objective medical evidence does not support his testimony.  (AR

4  571-75).

5

6      As a basis for discounting Plaintiff's subjective testimony, the

7  ALJ summarized the doctors' reports finding that Plaintiff appeared to

8  be exaggerating his symptoms.  (AR 574).  The ALJ observed that several

9  doctors reported that Plaintiff exaggerated responses to stimuli and did

10  not exert full effort during examinations.  (AR 574).  For example, in

11  a report dated March 17, 2005, Dr. Laurence Meltzer observed that

12  "[Plaintiff] is not totally cooperative.  I can only bend his left knee

13  to 90 degrees (out of a possible 140 degrees), and I must coax him to

14  allow me to do this, despite the fact that he sits with his knees flexed

15  to 90 degrees on the examining table." (AR 365).  Further, Dr. Meltzer

16  noted that Plaintiff was uncooperative despite the fact that Plaintiff's

17  ability to extend his knees bilaterally was normal and there was "no

18  pathology in either knee." (Id.).  Dr. Meltzer also noted that "[t]here

19  [was] no swelling, redness, increased heat or deformity in or around the

20  knees.  There [was] no effusion.  There [was] no patellofemoral grating

21  or pain with patellofemoral compression.  There [was] no collateral,

22  cruciate or rotatory instability.  There [were] no masses in the

23  popliteal fossa nor tenderness over the pes anserine bursa.  McMurray's

24  test [was] negative for a torn medial and/or lateral meniscus.  Pivot-

25  shift test [was] negative.  Lachman's test [was] negative." (Id.).

26  Finally, Dr. Meltzer reported that Plaintiff was uncooperative during

27  an examination of his ankles, feet, and toes.  (Id.).  Specifically, Dr.

28  Meltzer observed that "[e]xamination of [Plaintiff's] ankles and feet

26

1 is within normal limits, however, he does resist, and I must constantly
2 tell him to allow me to examine him and relax, that I am 'not going to
3 hurt him.'" (Id.).  Further, as the ALJ explained, personality test
4 results indicate that Plaintiff was exaggerating or "faking" his alleged
5 disability.  (See AR 345, 574).  In a report dated March 31, 2004, Dr.
6 Robert D. McDaniel noted that on the Minnesota Multiphasic Personality
7 Inventory-2, Plaintiff "scored an invalid profile" and that "'faking
8 bad' is the most likely reason." (AR 345).

10    The ALJ also observed that Plaintiff gave inconsistent answers
11 regarding not only his ability to care for himself but also his ability
12 to leave home and the frequency with which he drove. (AR 574).  As the
13 ALJ noted, while Plaintiff testified that he was "scared to go nowhere
14 [sic]" after the 2002 incident, (AR 697), the record clearly establishes
15 that Plaintiff traveled "around the world" at least twice after the
16 incident. (AR 574).  During an April 2009 hospitalization for stent
17 placement, Plaintiff "mention[ed] plans that he was within a week or so
18 planning to go back home to visit his family in Jordan." (AR 10).  More
19 recently, Plaintiff traveled to Jordan in 2011. (AR 687-88).  The ALJ
20 also accurately observed that in a March 15, 2005 psychological
21 examination report, Dr. Romauldo R. Rodriguez observed that "[Plaintiff]
22 can leave home alone." (AR 357).  Dr. Rodriguez reported that "[f]or
23 transportation, [Plaintiff] drives his own automobile." (Id.).  Dr.
24 Rodriguez also reported that Plaintiff's other "[o]utside activities
25 include walking." (Id.).

1    Plaintiff also provided inconsistent testimony about his ability
2   to care for himself.  At the hearing, Plaintiff testified that he was
3   unable to dress himself without assistance during the period from 2002
4   to 2006.  (AR 695).  Plaintiff testified that he had difficulty taking
5   a shower or a bath without assistance.  (Id.).  Specifically, Plaintiff
6   stated that "I cannot be standing in the shower.  I have somebody to
7   hold me . . . ."  (Id.).  However, this testimony is contradicted by Dr.
8   Rodriguez's March 2005 report, noting that while "[Plaintiff] is careful
9   not to easily admit that he does household chores," Plaintiff stated
10  that he "can take care of self-dressing, bathing, and personal hygiene."
11  (AR 357).  The ALJ cited these inconsistent statements as a separate
12  ground for discounting Plaintiff's testimony.  (AR 574).  The Court
13  finds that the discrepancies between the record and Plaintiff's
14  testimony constitutes a clear and convincing reason to discount
15  Plaintiff's testimony.  Accordingly, the ALJ provided clear and
16  convincing reasons to reject Plaintiff's subjective testimony and no
17  remand is required.

18
19  **B.   The ALJ Provided Specific And Legitimate Reasons For Discounting**
20       **Dr. Fenison's Opinion**

21
22       According to Plaintiff, the ALJ's "failure to properly consider the
23  opinions of the treating physician Dr. Fenison regarding Plaintiff's
24  physical limitations clearly constitutes reversible error."  (Id. at 8).
25  Plaintiff further argues that Dr. Fenison's conclusions indicate that
26  Plaintiff would be precluded from performing the occupations listed by
27  the ALJ at step five.  (Complaint Mem. at 7).  For example, Plaintiff
28

alleges that "the occupation of Small Product Assembler identified by the vocational expert . . . and relied upon by the ALJ in her decision . . . would be precluded based on its repetitive nature and the fact that it would obviously require repetitive motions involving Plaintiff's cervical spine." (Id.).

However, Plaintiff's argument that the ALJ failed to consider Dr. Fenison's opinions is not supported by the record. The most recent ALJ decision incorporated by reference the prior decision. Because this action was remanded only on the issue of mental impairments, the ALJ's incorporation of the prior decision's analysis of other issues was proper. As the ALJ accurately noted and as this Court discussed above, the remand order directed the ALJ to re-evaluate Plaintiff's RFC with non-exertional mental limitations and further consider Plaintiff's credibility. (See AR 566, 578-93; see also AR 587 n.4). The ALJ was not instructed to reconsider evidence pertaining to Plaintiff's alleged physical impairments.[3] Indeed, the ALJ did not need to evaluate Dr. Fenison's reports on remand because such reports pertain only to Plaintiff's alleged physical impairments. Furthermore, the first ALJ's decision adequately addressed Dr. Fenison's reports. Accordingly, Plaintiff's claim fails.

Even if the ALJ had given additional consideration to Dr. Fenison's findings, it is unclear that Dr. Fenison's reports would support Plaintiff's alleged disability. In his complaint, Plaintiff selectively

---

[3]   The Court notes that this may explain why the review of Plaintiff's medical history in the most recent ALJ opinion largely focuses on the period of time subsequent to the first opinion.

quotes portions of Dr. Fenison's reports.  Plaintiff cites Dr. Fenison
as finding, among other things, that Plaintiff should be "precluded from
performing any repetitive motions involving the cervical spine" along
with "any heavy work or prolonged stationary positioning involving the
lumbar spine." (Complaint Mem. at 4-5) (quoting AR 331).  However,
Plaintiff ignores Dr. Fenison's conclusion that while Plaintiff was
"unable to return to his usual and customary duties," he "should be
allowed to undergo vocational rehabilitation" and "is limited to light
work . . . in a very benign atmosphere." (AR 331).  The first ALJ
opinion accurately noted that Dr. Fenison found Plaintiff would be
"limited to light work with continued use of his cane for assistance and
with ambulation." (AR 53).  Thus, any failure to consider Dr. Fenison's
opinions on remand could only be considered harmless error, as
consideration of Dr. Fenison's opinions would not have altered the
outcome.  See Carmickle v. Comm'r of Soc. Sec. Admin., 533 F.3d 1155,
1162 (9th Cir. 2008) (if ALJ's error was inconsequential to the ultimate
nondisability determination, no remand required).

Finally, to the extent that Dr. Fenison's opinions may have been
rejected, the first ALJ opinion provides specific and legitimate reasons
for doing so.  Although the opinion of a treating physician is entitled
to great deference, it is "not necessarily conclusive as to either the
physical condition or the ultimate issue of disability." Morgan v.
Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).  When a
treating doctor's opinion is contradicted by another doctor, "the
Commissioner may not reject his opinion without providing 'specific and
legitimate reasons' supported by substantial evidence." Benton ex rel.
Benton v. Barnhart, 331 F.3d 1030, 1036 (9th Cir. 2003) (quoting Lester

v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)).  An ALJ may allow less
weight to a treating physician's opinions when the treating physician's
opinions conflicted with those of a non-examining physician and the non-
examining physician's opinions were consistent with the record.
Magallanes v. Bowen, 881 F.2d 747, 751-755 (9th Cir. 1989).

Here, the first ALJ opinion accurately noted that in March of 2005,
Dr. Laurence Meltzer saw Plaintiff for a consultative orthopedic
evaluation and concluded that Plaintiff had the ability to "lift/carry
up to 20 pounds occasionally; sit for unlimited periods of time; [and]
stand/walk with his cane for four hours in an eight-hour workday."  (AR
53).  The ALJ also correctly observed that Dr. Meltzer reported
Plaintiff had "full cervical range of motion, but limited lumbar range
of motion;" did not appear to "put forth full effort, as he moved on and
off the examining table with very little effort and went from the supine
to the sitting position and vice versa without difficulty;" had a normal
heel-toe gait when using his cane; extended his knees fully; and had no
abnormalities in his upper extremities.  (AR 53).  Dr. Meltzer's
conclusion is consistent with evidence in the record that Plaintiff
exercises and goes on walks.  (AR 114, 122).  Dr. Meltzer's opinion is
also consistent with evidence that, during several examinations,
Plaintiff exaggerated his symptoms and did not exert full effort during
physical tests.  (AR 251-57, 365).  Reliance upon Dr. Meltzer's
opinions, which were consistent with evidence in the record, was a
legitimate and specific reason to reject Dr. Fenison's opinions.
Accordingly, no remand is required.

\\

**C.   The ALJ Gave Specific and Legitimate Reasons For Discounting The Opinions Of Drs. Neudeck-Dicken And Oluwafemi Adeyemo**

Plaintiff contends that "his mental symptoms and limitations are far more severe than was found by the ALJ in her residual functional capacity assessment." (Complaint Mem. at 9). As support for this claim, Plaintiff alleges that the ALJ improperly discounted an April 25, 2008 report completed by Dr. Neudeck-Dicken and a May 26, 2008 consultive psychological evaluation performed by Dr. Oluwafemi Adeyemo. (Id.). However, while a retrospective diagnosis or opinion may be "relevant to the determination of a continuously existing disability with onset prior to expiration of insured status," Flatten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1461 n.5 (9th Cir. 1995), the ALJ properly discounted the opinions of Drs. Neudeck-Dicken and Adeyemo on multiple specific and legitimate grounds.

**1.   Dr. Neudeck-Dicken**

As Plaintiff notes, Dr. Neudeck-Dicken found that his symptoms became more severe following a heart attack that occurred after the last-insured date. (Id. at 10). In a 2008 report, after examining Plaintiff, Dr. Neudeck-Dicken did indeed conclude that "[a]n incident such as a heart attack, [sic] can cause the reoccurrence of the symptoms of PTSD" and that "[Plaintiff's] symptoms have increased post the heart attack." (AR 652-63). She also stated that Plantiff made great strides in his [PTSD] until he sustained a heart attack last year." (AR 652). Finally, Dr. Neudeck-Dicken diagnosed Plaintiff with "Posttraumatic Stress Disorder, Chronic," "Adjustment Disorder with mixed Anxiety and

1  depressed mood [sic]," "Adjustment Disorder with withdrawal [sic]," and
2  "Somatization Disorder."   (AR 655).   However, the ALJ provided
3  legitimate and specific reasons for discounting Dr. Neudeck-Dicken's
4  opinions.

5

6       As the Court explained in its discussion of Dr. Fenison's reports,
7  the opinion of a treating physician is generally entitled to great
8  deference.   However, such an opinion is "not necessarily conclusive as
9  to either the physical condition or the ultimate issue of disability."
10 Morgan, 169 F.3d at 600.   "If a treating or examining doctor's opinion
11 is contradicted by another doctor's opinion, an ALJ may only reject it
12 by providing specific and legitimate reasons that are supported by
13 substantial evidence."   Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th
14 Cir. 2005).   Indeed, less weight may be given to a treating physician's
15 opinion where it conflicts with that of a non-examining physician and
16 the non-examining physician's opinion is consistent with the record as
17 a whole.   Magallanes, 881 F.2d at 751-755.

18

19      Here, Plaintiff alleges that the ALJ "reject[ed] the entirety of
20 Dr. Neudeck-Dicken's report" because Dr. Neudeck-Dicken had not examined
21 Plaintiff in several years, the report was based solely on Plaintiff's
22 statements, and at least some of those statements were inconsistent with
23 the record.   (Complaint Mem. at 10).   However, Plaintiff is mistaken.
24 The ALJ did not "reject" Dr. Neudeck-Dicken's report.   Instead, the ALJ
25 gave the report substantial consideration but "did not give [it] great
26 weight."   (AR 573).

27

28

33

1    As a basis for discounting Dr. Neudeck-Dicken's report, the ALJ

2    explained that "Dr. Neudeck-Dicken had not seen [Plaintiff] for several

3    years, when [Plaintiff] returned, complaining of [depression and

4    anxiety]." (AR 574).   The ALJ also explained that "[i]t appears Dr.

5    Neudeck-Dicken relied on [Plaintiff's] statements that he did not leave

6    his house, but the record indicates otherwise." (Id.).   Indeed, Dr.

7    Neudeck-Dicken reported that Plaintiff presented with symptoms including

8    "fearfulness of leaving the home." (AR 652).   However, the record

9    repeatedly shows that Plaintiff left his home following the 2002

10   incident.   To establish that Dr. Neudeck-Dicken's opinion was not

11   supported by the record, the ALJ cited Dr. Rodriguez's March 15, 2005

12   report.   (AR 574).   In that report, Dr. Rodriguez noted that

13   "[Plaintiff] can leave home alone." (AR 357).   Dr. Rodriguez also noted

14   that "[f]or transportation, [Plaintiff] drives his own automobile."

15   (Id.).   Finally, Dr. Rodriguez observed that Plaintiff's other

16   "[o]utside activities include walking." (Id.).   Dr. Rodriguez's report

17   is consistent with the record as a whole.   As explained above in the

18   discussion of Plaintiff's credibility, the record establishes that

19   Plaintiff not only drove to the market, pharmacy, and shopping center

20   by himself after the 2002 incident but also traveled internationally on

21   at least two occasions.   Accordingly, the Court finds that the ALJ

22   provided specific and legitimate reasons for discounting Dr. Neudeck-

23   Dicken's opinion.[4]

24   _____

25       [4] Plaintiff might contend that because Dr. Neudeck-Dicken's 2008
     report summarizes Plaintiff's condition following a 2007 heart attack,
26   (see AR 652-63), the fact that Plaintiff drove and left his home prior
     to 2007 does not contradict Dr. Neudeck-Dicken's report.   However, the
27   Court notes that the period of time most relevant to the ALJ's decision
     is the period between Plaintiff's alleged disability onset date of
28   October 24, 2002 and his last-insured date of June 30, 2006.   The Court

1       **2.  Dr. Adeyemo**

2

3       Plaintiff also contends that the ALJ improperly discounted Dr.

4    Adeyemo's May 26, 2008 examination.  (Complaint Mem. at 11).  Plaintiff

5    emphasizes that Dr. Adeyemo "diagnosed Plaintiff with having Post

6    Traumatic Stress Disorder, chronic, major depressive disorder recurrent

7    severe without psychotic features, and R/O anxiety disorder" and found

8    Plaintiff to have a GAF score of 45.  (Id.).  Plaintiff alleges that the

9    ALJ rejected Dr. Adeyemo's report because Dr. Adeyemo saw Plaintiff "on

10   a one-time basis, and because his opinion is outweighed by the totality

11   of the evidence, which reveals that [Plaintiff's] depressive and anxiety

12   symptoms are largely controlled, both with and without psychiatric

13   medication."  (Id.).  Plaintiff contends that this basis for discounting

14   Dr. Adeyemo's report "makes no sense whatsoever."  (Id.).  According to

15   Plaintiff, "to reject all medical opinions such as Dr. Adeyemo's simply

16   because they only evaluated the individual on a 'one-time basis' [would

17   mean that] none of the Social Security consultative examination reports

18   would be given any weight whatsoever since they are also conducted on

19   a 'one-time basis.'"  (Id. at 11-12).

20

21       As an initial matter, Plaintiff is mistaken that the ALJ failed

22   to give Dr. Adeyemo's opinion any weight.  Plaintiff is correct that Dr.

23   Adeyemo diagnosed him with a GAF of 45 and "Post Traumatic Stress

24   further notes that the ALJ both found that period most relevant to
25   Plaintiff's claim and emphasized that Dr. Neudeck-Dicken's report is
     dated April 25, 2008, "well beyond the date last insured." (AR 572).
26   Further, at least one of Plaintiff's international trips occurred as
     late as 2011, three years after Dr. Neudeck-Dicken's report.  Finally,
27   according to Dr. Neudeck-Dicken, prior to Plaintiff's heart attack,
     Plaintiff was able to "leave his home with his wife and travel to Las
28   Vegas."  (AR 656).

Disorder, Chronic," Major Depressive Disorder Recurrent Severe without
Psychotic Features, [and] R/O Anxiety Disorder . . . ." (See AR 660).
However, the ALJ provided a comprehensive summary of Dr. Adeyemo's
conclusions.  The ALJ noted Dr. Adeyemo's diagnosis along with his
conclusion that Plaintiff "should not be placed in a regular work
environment" given his symptoms of depression and anxiety.  (AR 573,
660).  The ALJ simply "d[id] not give great weight to the opinions . .
. ."  (AR 573).  Instead, the ALJ provided clear and specific reasons
for discounting Dr. Adeyemo's opinions.

     The Ninth Circuit has explained that an ALJ may give less weight
to an examining doctor's opinion "for lack of objective support."
Tonapetyan, 242 F.3d at 1149.  Further, an ALJ may give less weight to
an examining doctor's opinion than to a treating physician's opinion on
the basis of the examining doctor's limited observation of the
plaintiff.  Lester, 81 F.3d at 832.  Here, the ALJ discounted Dr.
Adeyemo's opinion because "Dr. Adeyemo saw [Plaintiff] on a one-time
basis, and his opinion is outweighed by the totality of the evidence,
which reveals that the claimant's depressive and anxiety symptoms are
largely controlled, both with and without psychiatric medications." (AR
573).  The Court notes that in his March 2005 report, Dr. Rodriguez
noted that Plaintiff was "reasonably stable" on his psychiatric
medication and "ha[d] no functional limitations" based on the
examination.  (AR 360).  Further, as an example of where the record
contradicts Dr. Adeyemo's opinion, the ALJ cited reports from
Plaintiff's treating psychologist.  (AR 574).  Specifically, in 2004,
Dr. Neudeck-Dicken reported that Plaintiff "has made great strides in
his posttraumatic stress disorder" and is "no longer isolating himself

within his home." (AR 234).  Dr. Neudeck-Dicken also reported that
Plaintiff "is now getting out and going to places with his cousins as
well as on trips with his wife. He is also once again driving." (Id.).
Dr. Neudeck-Dicken noted that Plaintiff's "cognitive functioning has
greatly improved.  He is no longer confused, and demonstrates increased
concentration.  He is now reading, going to the library, and using his
computer to study various subjects of interest to him." (AR 235).
Finally, Dr. Neudeck-Dicken reported that Plaintiff "truly enjoys being
with people and has picked up his former relationships with family and
friends." (Id.).  As the ALJ explained, the record indicates that Dr.
Adeyemo only saw Plaintiff on one occasion.  (AR 28-31, 34).  The ALJ
provided numerous examples supporting his conclusion that "[Dr.
Adeyemo's] opinion is outweighed by the totality of the evidence." (AR
573).  Accordingly, the Court finds that the ALJ provided specific and
legitimate reasons to discount Dr. Adeyemo's opinions.

**D.    The ALJ's Reliance On The Vocational Expert's Testimony Was
        Supported By Substantial Evidence**

Finally, Plaintiff argues that the ALJ improperly relied on the
testimony of the vocational expert.  (AR 19-24).  The ALJ provided the
vocational expert with the following RFC:

[Plaintiff] has the residual functional capacity to perform
sedentary work (20 CFR 404.1567(a)). [Plaintiff] could lift
and carry 10 pounds occasionally and less than 10 pounds
frequently.  He could sit for 6 hours out of an 8-hour
workday, and he could stand and walk for 2 hours out of an 8-

37

1       hour  workday.   He  could  not  climb  ladders,  ramps,  or
2       scaffolds.  He could occasionally climb ramps and stairs; and
3       he could occasionally kneel, stoop, and crawl.  His mental
4       impairment limited him to simple, repetitive tasks, which
5       were  not  production  line.   He  could  work  in  an  object-
6       oriented work environment.

(AR 570).   After being asked whether there are jobs in the national
economy that  a person with Plaintiff's age, education, work experience,
and  RFC  could  perform,  the  vocational  expert  testified  that  such  a
person  could  perform  work  as  a  bench  assembler  of  small  products,
surveillance  system  monitor,  and  information  clerk.  (AR  576,  712-21).

    As  an  initial  matter,  the  Court  notes  that  in  order  for  the
vocational expert's testimony to constitute substantial evidence, the
hypothetical posed must "consider all of the claimant's limitations."
Andrews v. Shalala, 53 F.3d 1035, 1044 (9th Cir. 1995).  However, the
ALJ is not required to include limitations for which there was no
evidence.  See Osenbrock, 240 F.3d at 1164-65 (ALJ not bound to accept
as true the restrictions set forth in hypothetical if they were not
supported by substantial evidence). Here, Plaintiff contends that his
limitations preclude him from performing the jobs identified by the
vocational expert. (Complaint Mem. at 19-24). In sum, Plaintiff argues
that the vocational expert was wrong about what each job entails.
(Id.).  The Court disagrees.

1      **1.    Bench Assembler Of Small Products**

2

3           Plaintiff alleges that he could not be a small products assembler

4    because the ALJ's RFC excludes production line jobs and "the DOT

5    description of that occupation [requires] working on an assembly line."

6    (Complaint Mem. at 20). Specifically, Plaintiff asserts that "the ALJ's

7    preclusion from production line work activity, would clearly preclude

8    the occupation of small products assembler." (Id.). As support,

9    Plaintiff quotes, without citation, the DOT as providing that a small

10   products assembler "would 'perform any combination of following

11   repetitive tasks on assembly line to mass produce small products . . .

12   .'" (Id.). However, Plaintiff's argument is misplaced. The ALJ did not

13   preclude all assembly line work. The ALJ instead only precluded fast-

14   paced assembly line work. Indeed, the ALJ limited the vocational expert

15   to listing jobs involving "simple, routine, repetitive tasks in a work

16   environment free of fast-paced production requirements or assembly line

17   work, such as that involving a conveyor belt." (AR 712). Given this

18   restriction, the vocational expert testified that a person with

19   Plaintiff's RFC could perform work as an assembler of small products.

20   (AR 713).

21

22           Further, although the expert described a job that deviated slightly

23   from the DOT, the record supported Plaintiff's ability to perform this

24   job. An ALJ may rely on expert testimony that deviates from the DOT if

25   the records contain persuasive evidence to support the deviation. See

26   Johnson v. Shalala, 60 F.3d 1428, 1435 (9th Cir. 1995); Tommasetti, 533

27   F.3d at 1042. Here, the vocational expert limited the DOT definition

28   of small products assembler to only those small products assembler jobs

1  that are sedentary.  (AR 713).  The vocational expert not only testified

2  that sedentary small products assembler positions exist but also

3  quantified the number of such jobs in the national and local economy.

4  (Id.).   The ALJ's reliance on the vocational expert's testimony,

5  including the slight deviation from the DOT, is thus supported by

6  substantial evidence.   Further, as explained above, the vocational

7  expert identified small products assembler jobs that can be performed

8  by someone with Plaintiff's RFC.  Accordingly, Plaintiff's argument that

9  the ALJ improperly relied upon the vocational expert's testimony fails.

10

11     **2.    Surveillance System Monitor**

12

13     Plaintiff also contends that his impairments precluded him from

14  being a surveillance system monitor.  (Complaint Mem. at 20-22).

15  Plaintiff cites "Wikipedia" for the proposition that he could not work

16  as a surveillance system monitor because it is neither a sedentary nor

17  unskilled position.  (Id.).  According to Plaintiff, "'[v]ery few, if

18  any, employers ask employees to simply sit and watch a bank of monitors

19  all day long.  Rather, in order to avoid excessive boredom, fatigue, and

20  the resultant poor performance, employers ask surveillance system

21  monitors to do a wider variety of security related tasks throughout the

22  work day, thus rendering the exertional level required to do the

23  occupation greater than sedentary.'"  (Complaint Mem. at 21-22) (quoting

24  Wikipedia).  Plaintiff also alleges that surveillance system monitor is

25  not an unskilled occupation because "'in the post 9/11 world,

26  experienced and trained workers are needed'" and because "'[s]ome say

27  that effective monitoring in the [gambling] industry requires training

28  beyond what would be considered required for unskilled work.'"  (Id. at

22) (quoting Wikipedia).  Plaintiff additionally states that he "downloaded" two job postings for surveillance system monitor and that those postings prove that work as a surveillance system monitor requires quantitative, communicative, and other skills beyond Plaintiff's ability.  (Id. at 22).

The Court first notes that "[t]he DOT is the best source for how a job is generally performed," Carmickle, 533 F.3d at 1166 (internal quotation marks omitted)), and the Court questions the reliability of Wikipedia as a source.  To the extent Plaintiff is complaining again about the vocational expert's alleged deviation from the DOT, the Court notes that an ALJ may rely on expert testimony that deviates from the DOT if the records contain persuasive evidence to support the deviation. See Johnson, 60 F.3d at 1435. Here, the vocational expert provided a DOT definition for "government service surveillance monitor."  (AR 713). The vocational expert then discussed the position further, explaining that surveillance monitors are found throughout the labor market and that being a monitor is a "fairly flexible occupation" that can be performed on a sedentary basis.  (Id.).  Tommasetti, 533 F.3d at 1042. The expert also quantified the number of surveillance system monitor positions that are available at both the national and regional level. (AR 713).  Accordingly, the Court finds that despite Plaintiff's reference to Wikipedia and despite the two job postings that Plaintiff provides as evidence that the position entails work beyond Plaintiff's RFC, the ALJ did not err in relying on the vocational expert's testimony about the requirements of work as a surveillance system monitor.  While

1  some system monitor positions no doubt require job skills that are not
2  required by other surveillance system monitor positions, the vocational
3  expert's testimony relates to the occupation in general and is supported
4  by the DOT.

6  **3.    Information Clerk**

8       Finally, Plaintiff alleges that he cannot perform work as an
9  information clerk.  When the vocational expert testified that a person
10 with Plaintiff's RFC could perform work as an information clerk, the
11 expert explained that "[t]here is no good DOT match with what is done
12 today." (AR 713).  The expert then deviated from the DOT for train
13 information clerk to information clerk positions found outside the
14 transportation sector and explained that there are approximately 52,000
15 jobs nationally and 1,200 regionally. (Id.).  Nevertheless, Plaintiff
16 contends that a person with his RFC could not work as an information
17 clerk because (1) "every aspect of the occupation of information clerk
18 pertains to dealing with people rather than objects;" and (2) "the ALJ's
19 RFC, which included 'He could work in an object-oriented work
20 environment' would clearly preclude the performance of the occupation
21 of information clerk." (Complaint Mem. at 24).  According to Plaintiff,
22 the DOT definition of an information clerk is someone who "provides
23 travel information for bus or train patrons; [a]nswers inquiries
24 regarding departures, arrivals, stops, and destinations of scheduled
25 buses or trains." (Id.).  Plaintiff claims that "[w]hether it is an
26 information clerk in a train depot, an airport, a shopping mall, or a

42

1  public office building, all of these information clerks involve dealing

2  with people rather than objects and thus they would clearly be precluded

3  by the ALJ's own assessment of Plaintiff's residual functional

4  capacity." (Id.).

6    As an initial matter, the Court notes that Plaintiff's RFC does not

7  clearly preclude all interaction with the public. It merely states that

8  Plaintiff "could work in an object-oriented environment." (AR 570).

9  It does not state that Plaintiff can only work in an object-oriented

10  environment. Accordingly, Plaintiff's claim fails to the extent that

11  he is not limited only to work in an object-oriented environment.

13    The Court further notes that Plaintiff's claim would fail even if

14  Plaintiff were somehow able to establish that he is limited exclusively

15  to work in an object-oriented environment. Indeed, the vocational

16  expert explained that even if "the person [with Plaintiff's RFC] would

17  work better with objects than with individuals," that person could

18  perform any of the three jobs, including information clerk. (AR 714).

19  The vocational expert also explained that the information clerk position

20  would only be precluded if such a person could not interact with the

21  public at all. (Id.). Notably, however, Plaintiff does not claim that

22  he is completely unable to interact with the public. Instead, Plaintiff

23  contends that he could not be an information clerk because "[the]

24  occupation . . . involve[s] dealing with people rather than objects the

25  vast majority of the work day [sic]." (Complaint Mem. at 24). To the

26  extend that Plaintiff admits he is capable of some interaction with the

27  public, he is capable of working as an information clerk.

Finally, the vocational expert testified that even if interaction with the public were completely precluded, a person with Plaintiff's RFC could work as a small products assembler or surveillance system monitor. (AR 714-15).  There is no evidence that either position is anything but object-oriented.  Nor does Plaintiff argue that either position is not object-oriented.  Accordingly, the Court finds that even if Plaintiff were restricted to object-oriented jobs, the ALJ did not commit error by concluding jobs existed that Plaintiff could perform.  Thus, Plaintiff's contention that the ALJ improperly relied on the vocational expert's testimony fails.

## VIII.

### CONCLUSION

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[8] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: January 29, 2013.

                                        /S/
                                   _____
                                   SUZANNE H. SEGAL
                                   UNITED STATES MAGISTRATE JUDGE

---

[8]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."